IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 3:15CR358 |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | |
| | ) | |
| ASIF AHMED SALIM, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S FIRST |
| Defendant-Petitioner. | ) | MOTION FOR BOND |
| | ) | |

Now comes the United States of America, by and through its attorneys, Steven M. Dettelbach, United States Attorney, and Matthew W. Shepherd, Assistant U.S. Attorney, and submits this response in opposition to Defendant Asif Salim's First Motion for Bond. (Doc. 34). For the following reasons, the government opposes the Defendant's release on bond and requests that his motion be denied.

**I. PROCEDURAL HISTORY**

On September 30, 2015, Asif Salim was charged in three counts of a four-count indictment charging him with Conspiracy to Provide Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 1); Providing Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 2); and Conspiracy to Obstruct Justice in violation of 18 U.S.C. §

1512(k). (R.1: Indictment). The indictment alleges that Salim conspired to provide and did provide funds to Anwar Al-Awlaki for use in conducting terrorist attacks and that Salim and his co-conspirators conspired to obstruct the investigation into the provision of these funds. Salim's co-defendants include his brother, Sultane Roome Salim and another pair of brothers, Yahya Farooq Mohammad and Ibrahim Zubair Mohammad.

Although a United States citizen, at the time of the indictment and for approximately the last four years, Salim has been living outside the United States. After his indictment, Salim was detained and consented to deportation back to the United States. Upon his arrival in the United States in the Eastern District of Virginia, he was arrested on the indictment on November 12, 2015. After making his initial appearance in the Eastern District of Virginia, Salim ultimately waived his rights to an identity hearing and detention hearing in that district, consenting to his transfer to the Northern District of Ohio in custody. He was arraigned on November 25, 2015, and pled not guilty to all counts. At that time, the government moved for detention. Salim waived his right to a hearing at that time, but reserved the right to file a motion for bond and a detention hearing at a later date. On January 12, 2016, Salim filed the instant First Motion for Bond. (R.34: First Motion for Bond).

II. ARGUMENT

Defendant Asif Salim's motion for release on bond should be denied because the conditions of release he has proposed do not overcome the presumption of detention contained at 18 U.S.C. § 3142(e)(3)(C), and because he poses a risk of flight and danger to the community.

    *a.)*    *Salim is subject to a presumption of detention.*

When considering whether a defendant should be released on bond, "[t]he default position of the law … is that a defendant should be released pending trial." United States v.

Stone, 608 F.3d 939, 945 (6th Cir. 2010). "That default is modified, however, for certain, particularly dangerous defendants." Id. For such defendants, there is a statutory presumption in favor of detention. 18 U.S.C. § 3142(e)(3) provides:

> (3) Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed—
>
>> (A) an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21U.S.C. 951 et seq.), or chapter 705 of title 46;
>> (B) an offense under section 924(c), 956(a), or 2332b of this title;
>> (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed;
>> (D) an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or
>> (E) an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.

18 U.S.C. § 3142(e)(3).

In this case, Salim qualifies as one of those "particularly dangerous defendants" for whom the statutory presumption of detention applies because he was indicted and charged with conspiracy to provide material support to terrorists in Count 1 in violation of 18 U.S.C. §2339A and providing material support to terrorists in Count 2 in violation of 18 U.S.C. § 2339A, both of which are federal crimes of terrorism listed at 18 U.S.C. § 2332b(g)(5)(B) that have maximum punishments greater than 10 years. This places Counts 1 and 2 in the category of offenses covered by the presumption in 18 U.S.C. § 3142(e)(3)(C) described above. An indictment returned by a grand jury is a sufficient finding of probable cause to invoke the presumption. See

United States v. Hazime, 762 F.3d 34, 37 (6th Cir. 1985). Thus, the presumption of detention applies to Salim.

      b.)    *Salim's proposed conditions of release do not rebut the presumption of detention.*

Although the presumption of detention applies, Salim can rebut the presumption by introducing some evidence that he is not a danger to the community or a flight risk. See Stone, 608 F.3d at 945. Although this is not a heavy burden, in this case, Salim has not met that burden with his proposed bond conditions. Salim has lived out of the country in the for approximately the last four years and proposes to reside now in the Atlanta, Georgia area. A defendant who has not even lived in the country for several years should not be found to have overcome the presumption that he is a danger or a flight risk by proposing to reside in a state in a different part of the country from the district with pending charges. Not all proposed living arrangements and bond conditions should be viewed as overcoming the presumption, and this is one of those situations.

      c.)    *Even if Salim has rebutted the presumption of detention, he should still be detained pending trial.*

Should the Court determine that Salim's proposed conditions do rebut the presumption of detention, Salim's release is not automatic. The Court must still consider whether detention is appropriate, and the presumption of detention remains a factor in favor of pretrial detention. As the Sixth Circuit has explained:

> Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighted by the district court.' The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.

Id. (citations omitted).

When considering whether a defendant should be released on bond, the Court should consider several factors, along with the presumption of detention:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(ix) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g). "The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence." United States v. Hinton, 113 F. App'x 76, 77 (6th Cir. 2004); 18 U.S.C. § 3142(f) (stating that the burden of proof for showing danger to the community is by clear and convincing evidence).

Consideration of the 3142(g) factors leads to the conclusion that Salim should be detained pending trial:

1.) <u>Nature and circumstances of the offense charged</u>

Salim is charged with a federal crime of terrorism, one of the classes of offenses specifically listed in the statute as a factor for the Court to consider. This shows the seriousness with which Congress intended courts to take terrorism offenses such as those committed by Salim when considering pretrial release. The circumstances of this case show just how serious the charged offenses are. The core of the offenses charged is that Salim conspired with his co-defendants to provide Anwar Al-Awlaki with approximately $29,000, including $2,000 specifically from Salim, for the purposes of committing terrorist acts. This case did not involve a "sting" by government agents in which the funds that were provided never actually reached a terrorist. In this case, the money provided by Salim and his co-conspirators went to a real terrorist who shortly thereafter actively engaged in an attempted attack on United States citizens.

The identity of the terrorist in this case and the timing of the provision of the funds illustrate the seriousness of the offense. Anwar Al-Awlaki actively plotted with members of Al-Qaeda in the Arabian Peninsula to commit terrorist acts against the United States. On July 16, 2010, Awlaki was specifically designated as a key leader for al-Qa'ida in the Arabian Peninsula ("AQAP")[1] by the Department of the Treasury pursuant to Executive Order 13224. The press release announcing Awlaki's designation explained Awlaki's (also known as "Aulaqi") role: "Aulaqi has pledged an oath of loyalty to AQAP emir, Nasir al-Wahishi, and plays a major role in setting the strategic direction for AQAP. Aulaqi has also recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's

---

[1] AQAP was designated a Foreign Terrorist Organization by the Department of State on January 19, 2010.

6

attention on planning attacks on U.S. interests." U.S. Dept. of Treasury, "Treasury Designates Anwar Al-Aulaqi, Key Leader of Al-Qa'ida in the Arabian Peninsula," July 16, 2010 (Exhibit 1). As described in the indictment, Awlaki also published numerous articles on the internet supporting violent jihad, (R.1: Indictment, PageID 4-11), and praised Nidal Hassan for killing 13 United States service members at Fort Hood, Texas on November 5, 2009, calling him a "hero." (Id., at 10-11.) .

The timing of the money provided by the defendants to Awlaki further shows the seriousness of the offense in this case. As described in the indictment, co-defendant Yahya Farooq Mohammad and two other individuals traveled to Yemen at the end of July 2009 to provide approximately $22,000 in funds to Awlaki, including the $2,000 provided by Salim. This money was provided to an associate of Awlaki on approximately July 26, 2009. (Id., at 57-58). On December 25, 2009, Umar Farouk Abdulmutallab attempted to destroy Northwest Airlines Flight 253 over Detroit, Michigan. According to court documents filed in Abdulmutallab's case, Awlaki and AQAP were behind that bombing attempt and trained Abdulmutallab to carry it out. The Sixth Circuit summarized the facts of Abdulmutallab's attempted terrorist attack when considering his appeal:

> Umar Farouk Abdulmutallab ("Abdulmutallab"), known nationally as the "underwear bomber," attempted to detonate an explosive device in his underwear on Christmas Day in 2009. Abdulmutallab's chosen path towards radicalization began in August 2009 when he traveled to Yemen for the purpose of becoming involved in a violent jihadist group associated with Al Qaeda, a designated terrorist organization pursuant to 18 U.S.C. § 2339B(a)(1) and 8 U.S.C. § 1189(a). During his time in Yemen, Abdulmutallab received training at an Al Qaeda camp under the direction of the radical Imam Anwar Awlaki and agreed to carry out a suicide attack by bombing a United States air carrier over the United States. The bomb given to Abdulmutallab was built into a pair of underwear and Abdulmutallab was assured that the bomb would defy airport security because it contained no metal parts.

7

United States v. Abdulmutallab, 739 F.3d 891, 895 (6th Cir. 2014). Abdulmutallab attempted to detonate the bomb while a passenger on Northwest Airlines Flight 253 with 289 passengers on board. Fortunately, the bomb did not operate as planned and no lives were lost. Id.

The importance of the timing of the provision of the funds to Awlaki is that they were provided at the end of July 2009, within weeks of Abdulmutallab's travel to Yemen to meet Awlaki and train in August 2009. Although there is no evidence to prove that the specific funds provided to Awlaki went specifically to Abdulmutallab's bombing attempt, the reasonable inference is that the funds provided to Awlaki at the end of July 2009 went into Awlaki's coffers as part of the pool of funds used to support training Abdulmutallab to blow up an airplane a few short weeks later.

Further, the amount of money was a significant amount of funds for use in terrorist operations for Awlaki at that time when he was in Yemen planning terrorist attacks with AQAP such as Abdulmutallab's attempt. The total amount provided by the defendants was approximately $29,000, spread out over two trips: approximately $7,000 in January 2009 and approximately $22,000 in July 2009. Salim's $2,000 was included in the July funds. AQAP itself has provided an idea of the significance of that amount of money. In November 2010, AQAP published an issue of its online, English-language magazine, Inspire, devoted to one of its failed terrorist attacks—an attempt to send bombs hidden in printer cartridges to targets in the United States using cargo planes. In that issue, an article explained that the cost of the plot was only $4,200. See Ibrahim, Yahya, "$4,200," Inspire, p. 15, November 2010; Shane, Scott, "Qaeda Branch Aimed for Broad Damage at Low Cost," New York Times, Nov. 20, 2010 (available at http://www.nytimes.com/2010/11/21/world/middleeast/21parcel.html?_r=0).

Thus, the total amount involved in the conspiracy would have paid the expenses of approximately *seven* printer bomb plots. Salim's contribution alone would have provided almost half of the funds for such an attack.

Media reports on the costs of other terrorist attacks also confirm the significance of the funds provided by Salim and his co-conspirators to a terrorist such as Awlaki. For example, in November 2015, NBC News reported that several notable terrorist attacks cost less than the amount provided to Awlaki by this conspiracy, including the November 2015 Paris attacks that killed 130 people ($10,000 or less); the 1998 bombings of embassies in Kenya and Tanzania that killed over 200 people($10,000); the 2000 bombing of the USS Cole in Yemen that killed 17 sailors ($5,000 to $10,000); and the 1993 World Trade Center bombing in New York that killed six people ($18,000). See Windrem, Robert, "Terror on a Shoestring: Paris Attacks Likely Cost $10,000 or Less," NBC News, Nov. 18 2015 (available at http://www.nbcnews.com/storyline/paris-terror-attacks/terror-shoestring-paris-attacks-likely-cost-10-000-or-less-n465711). NPR has also reported on the relatively low cost of conducting terrorist attacks, noting in June 2014 that the 2005 bombings in London that killed 57 people cost approximately $14,000. NPR further reported that a suicide vest can cost as low as $1,200 and a suicide car bomb from $13,000 to $20,000 . See Temple-Raston, Dina, "How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think," NPR, June 30, 2014 (available at http://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think). These media reports illustrate the significance of the amount of money provided by Salim and his co-conspirators, as each of the deadly terrorist attacks mentioned above cost less than the $29,000 provided to Awlaki in this case. Sadly, in the hands of a terrorist such as Awlaki, any amount of money can lead to death and destruction.

The seriousness of the conduct alleged in this case, with a large potential prison sentence looming, provides every incentive for Salim to flee and is an indicator of potential danger to the community.

In addition to the seriousness of the offense in this case, the grand jury also found probable cause to believe that Salim conspired to obstruct the investigation into the offenses in this case through lying to investigators and deleting emails. This demonstrates a consciousness of guilt on Salim's part and also shows the risk of further obstruction of justice if he were to be released on bond.

This factor weighs heavily in favor of detention.

       2.) <u>The weight of the evidence against the person</u>

"This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." <u>Stone</u>, 608 F.3d at 948. Further, "[b]y its terms, it deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community." <u>Hazime</u>, 762 F.2d at 37. These statements from the <u>Stone</u> and <u>Hazime</u> decisions explain that the reference to the weight of the evidence is not an invitation to a mini-trial on guilt or innocence of the specific charges in advance of the actual trial. Instead, this factor goes to the weight of the evidence relating to the risk of flight or danger to the community posed by release of the defendant. Thus Salim's claim that the prosecution's case against him is weak is an argument to make for the jury at trial, not at a detention hearing. Instead, the Court should consider the weight of the evidence as it relates to Salim's suitability for release.

The grand jury found probable cause to believe that Salim provided funds to Awlaki. As described in the indictment, Salim was party to numerous email communications with his co-

10

conspirators related to Awlaki and violent jihad. Further, he provided the funds by writing a check for $2,000 to Ibrahim Mohammad. Contrary to Salim's claims, his communications were not limited to merely being "cc'ed" on emails. He took an active part in the conspiracy. For example, after being emailed a copy of Awlaki's blog post entitled, "Establishing Khilafa," Salim forwarded the email on to others, including his brother Sultane Salim. (R.1: Indictment, PageID 22-23). And when it came to the sending of the money to Ibrahim Mohammad that was to be provided to Awlaki, Salim directed his brother Sultane Salim to send the check, telling him to "[g]it 'er done." (Id., at 56). Later, Salim inquired about the delivery of the money to Awlaki by email with Farooq Mohammad. (Id., at 62). The facts described in the indictment show Salim's support for Awlaki, that he sent money to him, and that he inquired about whether the money was received, all indications of Salim's support for Awlaki. This evidence goes to Salim's potential danger as it shows his support for a terrorist. The weight of the evidence also supports detention.

### 3.) The history and characteristics of the person

Salim's personal characteristics also support detention. Salim has no current community ties in the Toledo area and no history of having ever lived there. Although he is a United States citizen and grew up in Ohio, he has lived for approximately the last four years outside the United States and therefore can be presumed to have significant foreign connections. Because he has no ties to the Toledo area, he proposes to live in the Atlanta, Georgia area, several states away from Ohio. The proposed residence is with his mother-in-law, not an address where there is any claim he has ever lived before. Salim currently has no employment tying him to the Northern District of Ohio or to Georgia. In his favor, Salim has no criminal history, but "courts have never required a prior criminal record before ordering detention." Stone, 608 F.3d at 950. In this case,

11

the lack of a criminal history is outweighed by Salim's other personal characteristics: that he has no employment, that he has no community ties in the district where charges are pending, that he has lived outside of the United States for the last four years, and that he proposes to live in another part of the country.

        4.)      The nature and seriousness of the danger to any person or the community that would be posed by the person's release

As explained above, Salim is charged with conspiring to provide a significant amount of money to a terrorist, Anwar Al-Awlaki. From Salim's financial support of Awlaki one can infer that Salim supports the violent jihad against the United States advocated and practiced by Awlaki. Therefore, the nature of the danger posed by release of Salim is quite serious.

In support of his argument for release on bond, Salim points to examples from other terrorism prosecutions where defendants were released on bond. The Court must consider each defendant's unique circumstances and the fact that other courts released other defendants, who had their own unique circumstances, in different cases provides little instruction for this case. Even the case of Salim's brother and co-defendant, Sultane Roome Salim, involved different circumstances than posed by this defendant. For example, Sultane Salim had not lived outside of the United States for the last four years and did not propose to live several states away from the district of prosecution.

### III.   CONCLUSION

In light of the presumption of detention because the defendant is charged with a crime of terrorism, the seriousness of the offense in this case, the alleged obstruction of justice, the lack of community ties to the Northern District of Ohio, the lack of employment in any district, the lack of a residence in the Northern District of Ohio, the defendant's residence in a foreign country for the last four years, and a proposed residence in another part of the country, the defendant's

request for bond should be denied and he should remain detained pending trial. The conditions proffered by Salim are simply not sufficient to ensure the defendant's appearance at trial or the safety of the community under the facts of this case.

                                                     Respectfully submitted,

                                                     STEVEN M. DETTELBACH
                                                     United States Attorney

By:       /s/ Matthew W. Shepherd
                                                     Matthew W. Shepherd (OH: 0074056)
                                                     Assistant United States Attorney
                                                     United States Court House
                                                     801 West Superior Avenue, Suite 400
                                                     Cleveland, OH 44113
                                                     (216) 622-3859
                                                     Matthew.Shepherd@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that on this 20th day of January, 2016, a copy of the foregoing GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S FIRST MOTION FOR BOND was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                    /s/ Matthew W. Shepherd
                                                    Matthew W. Shepherd
                                                    Assistant U.S. Attorney