```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,-    Docket No. 3:15-cr-358-3
                                -
 5       Plaintiff,             -    Toledo, Ohio
                                -    January 21, 2016
 6           v.                 -    Detention Hearing
                                -
 7   ASIF AHMED SALIM,          -
                                -
 8       Defendant.             -
     -------------------------------
 9
                      TRANSCRIPT OF DETENTION HEARING
10              BEFORE THE HONORABLE JACK ZOUHARY
                   UNITED STATES DISTRICT JUDGE.
11
     APPEARANCES:
12
     For the Plaintiffs:  United States Attorneys' Office
13                        By: Christos N. Georgalis
                          Suite 400
14                        801 Superior Avenue, W
                          Cleveland, OH 44113
15                        (216) 622-3859

16   For the Defendant:   Linda G. Moreno
                          P.O. Box 10985
17                        Tampa, FL 33679
                          (813) 247-7454
18
     Court Reporter:      Tracy L. McGurk, RMR, CRR
19                        1716 Spielbusch Avenue
                          Toledo, Ohio 43604
20                        (419) 213-5520

21

22

23

     Proceedings recorded by mechanical stenography,
24   transcript produced by notereading.

25
```

1                    (Commenced at 2:46 p.m.)

2              THE COURT:  We're here on case 15-CR-358-03,

00:00:08    3    United States versus Asif Ahmed Salim.  The Defendant is

00:00:14    4    present in court along with his counsel, Linda Moreno.

00:00:17    5    And on behalf of the Government we have AUSA Christos

00:00:25    6    Georgalis.  And with him are Agents Laura Lebo and Sean

00:00:27    7    Pieja.

00:00:27    8              The Defendant is charged in an indictment

00:00:30    9    filed in September of last year in three counts:  Count

00:00:33   10    1, Conspiracy to Provide Material Support and Resources

00:00:36   11    to Terrorists; Count 2, Providing Material Support and

00:00:40   12    Resources to Terrorists; and Count 4, Conspiracy to

00:00:44   13    Obstruct Justice.

00:00:46   14              The Defendant was arraigned in November.  We

00:00:49   15    had a pretrial conference in December.  And the

00:00:52   16    Defendant has filed a motion for release, which brings

00:00:55   17    us together today.  That was filed in January; it is

00:00:59   18    reflected on our docket as document number 34.

00:01:02   19              The Government has opposed in a filing

00:01:05   20    reflected in document number 35.

00:01:09   21              The Court has also been provided and counsel

00:01:11   22    have been provided with Pretrial Services reports.  We

00:01:15   23    have two reports; a report from November 17-18 of 2015,

00:01:25   24    and then we have one from January 16.  The latter report

00:01:31   25    is from our Pretrial Services Department here,

00:01:36  1    specifically Mark Miller, who is also present in court.

00:01:40  2    The earlier reports were from Virginia, and those have

00:01:45  3    been shared, as I indicated, with everyone as well.

00:01:50  4          The Court has had an opportunity to review

00:01:52  5    the motion, the opposition, the reports from Pretrial

00:01:57  6    Services.  And I'll turn the floor over now to Defense

00:02:02  7    Counsel who may indicate to the Court whether it wishes

00:02:06  8    to offer any testimony, exhibits, or argument.

00:02:09  9          MS. MORENO:  Thank you, Your Honor.  I

00:02:12  10   appreciate it.  Your Honor, I'm going to be proffering

00:02:17  11   on behalf of Mr. Salim with respect to my motion for

00:02:21  12   release.  I do have a few family members that I do wish

00:02:25  13   to introduce to the Court, but I will be proffering what

00:02:28  14   they have to say.  And if the Court has any questions

00:02:32  15   for them, because of the children and the family

00:02:35  16   situation, they're in the jury room, and I propose to

00:02:38  17   bring them out one at a time very briefly.

00:02:42  18          Before I do that, however, just with respect

00:02:44  19   to the motion and the response to the motion, it seems

00:02:53  20   that what we have proposed to this Court is as close to

00:02:58  21   a guarantee as possible with respect to the bail

00:03:02  22   conditions that we have proposed.

00:03:06  23          Not to repeat too much, I think the Court

00:03:08  24   knows that there are two properties that are to be

00:03:11  25   pledged that, given whatever appraisal values, market

00:03:16    1    values add up to maybe $475,000.  Both of those

00:03:22    2    properties are located in Gwinnett County in Georgia.

00:03:29    3            I have been in contact with Mr. Miller of

00:03:31    4    Pretrial Services, and we have discussed the issue of

00:03:34    5    custodians.  Present today -- you will meet them, Your

00:03:39    6    Honor -- is Mr. Salim's mother-in-law, and -- Mr.

00:03:46    7    Salim's mother-in-law, Mr. Salim's wife, and Mr. Salim's

00:03:51    8    brother-in-law, and Mr. Salim's mother.  Mr. Salim's

00:03:56    9    mother, who you will meet very briefly, Shakila Salim,

00:04:01   10    she is the custodian for the co-defendant in this case,

00:04:05   11    Sultane Salim.  Sultane was released by the magistrate

00:04:11   12    several weeks ago, I believe seven or eight weeks ago in

00:04:15   13    this matter.

00:04:18   14            Mr. Salim's mother-in-law, Nikhat

00:04:24   15    Nizamuddin, who you will meet, is posting the family

00:04:27   16    property.  A word about family property.  And I know I'm

00:04:34   17    going about this in probably a different way, but I'm

00:04:37   18    giving Your Honor the overview first just very briefly.

00:04:40   19    The family property, which I would argue to the Court

00:04:44   20    has a component of a moral suasion to it in that this is

00:04:49   21    the family home that was built by Mr. Salim's in-laws

00:04:55   22    about 23 years ago.  This is the home that his wife,

00:05:01   23    Farah, grew up in and that his sister-in-law, Sabrina,

00:05:06   24    grew up in.

00:05:07   25            As the Court knows, in my paperwork I have

00:05:11  1    also offered Sabrina Nizamuddin as a character reference

00:05:16  2    and as a supportive family member for Mr. Salim.  She is

00:05:20  3    a current assistant district attorney also in Gwinnett

00:05:24  4    County, Georgia.  The family is very, very close.

00:05:31  5                I think that the conditions with respect to

00:05:33  6    the properties:  the GPS monitoring; the strict

00:05:37  7    electronic supervision; the surrender of passports,

00:05:41  8    which the family is willing to do today.  His wife Farah

00:05:48  9    has brought her passport along with along with four

00:05:52  10   passports of the four children.  They will surrender

00:05:55  11   those passports today.  Mr. Salim himself has no

00:05:59  12   passport.  I feel confident in saying it was seized and

00:06:04  13   in the custody of the Government.  I also believe that

00:06:08  14   that passport was expired.  He has no other passport, he

00:06:12  15   has no other travel documents.

00:06:14  16               THE COURT:  Let me interrupt you.  Can you

00:06:16  17   comment, is his passport in the custody of the

00:06:19  18   Government?  Do you know?

00:06:25  19               MR. GEORGALIS: Judge, the agent told me he

00:06:27  20   doesn't know for certain, but he's pretty confident it

00:06:39  21   is in Government custody.

00:06:41  22               THE COURT:  Do you know if it's expired or

00:06:43  23   not?

00:06:43  24               MR. GEORGALIS:  No, we don't know that,

00:06:45  25   Judge.  We will confirm that today.

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
| 00:06:49 | 1  | MS. MORENO:  Let me call his wife, Farah                  |
| 00:07:01 | 2  | Nizamuddin, into the courtroom, if I may.  Excuse me,     |
| 00:07:08 | 3  | Your Honor.                                               |
| 00:07:27 | 4  | (Farah Nizamuddin enters the courtroom.)                  |
| 00:07:37 | 5  | MS. MORENO:  Your Honor, I wanted to                      |
| 00:07:40 | 6  | introduces to the courtroom Asif Salim's wife, Farah      |
| 00:07:44 | 7  | Nizamuddin.                                               |
| 00:07:46 | 8  | THE WITNESS:  How are you.                                |
| 00:07:47 | 9  | MS. MORENO:  I would proffer to the Court                 |
| 00:07:48 | 10 | they've been married ten years.  They have four           |
| 00:07:51 | 11 | children.  It is her family home that is being offered    |
| 00:07:53 | 12 | as a property for security in this matter.  I would tell  |
| 00:07:57 | 13 | the Court that she is -- she's an American citizen born   |
| 00:08:02 | 14 | and raised in Georgia.  She has a degree in early         |
| 00:08:07 | 15 | childhood education.  As soon as Mr. Salim was arrested   |
| 00:08:13 | 16 | in the UAE, Farah took the children and immediately       |
| 00:08:19 | 17 | moved back.  I would proffer that they have no home in    |
| 00:08:22 | 18 | the UAE, no bank accounts, no property, no utility        |
| 00:08:30 | 19 | accounts.  The Visa has been cancelled.  It turns out     |
| 00:08:36 | 20 | that she has brought today to the Court -- and I just     |
| 00:08:42 | 21 | received it really a few minutes ago -- documents that    |
| 00:08:47 | 22 | reflect his employment when he was in the UAE for the     |
| 00:08:54 | 23 | four years that they were there.  And I haven't shown     |
| 00:08:57 | 24 | this to counsel yet because I literally just got them.    |
| 00:09:01 | 25 | But I would also offer this as an exhibit if the Court    |

00:09:04  1   is willing.  I will describe these documents as showing

00:09:10  2   that he was employed from 2011 for a year at the

00:09:18  3   International School of Creative Science, and then for

00:09:21  4   the following three years he was employed at the GISTEC

00:09:28  5   Leveraging GIS & IT Synergy.  And these documents

00:09:34  6   reflect each one of those years, employment letters, et

00:09:40  7   cetera.

00:09:40  8              THE COURT:  I think we should have copies

00:09:42  9   made.  Share it with the Government and provide it to

00:09:45 10   our deputy clerk, please.

00:09:53 11              MS. MORENO:  I would also indicate to the

00:09:56 12   Court on behalf of Farah that they moved back to the

00:10:01 13   family home in Atlanta, which is where we requested Asif

00:10:06 14   to be supervised.  And the children are going to be

00:10:09 15   starting school.  Of course, they have their

00:10:14 16   grandparents there.  The community ties issue are the

00:10:18 17   ties with the family.

00:10:25 18              I think, that's probably all I have.  If the

00:10:28 19   Court wishes to ask -- if the Court wishes to ask Mrs.

00:10:37 20   Nizamuddin any questions -- sorry, Your Honor.

00:10:40 21              THE COURT:  First of all, I'll give the

00:10:42 22   Government the opportunity.

00:10:43 23              Do you wish me to place her under oath, and

00:10:45 24   do you wish to ask any questions?

00:10:48 25              MR. GEORGALIS:  No, Judge, we're not going

00:10:50  1    to ask that she be placed under oath.  In lieu of that,

00:10:53  2    the Government has discussed with Ms. Moreno in chambers

00:10:58  3    a stipulation with this witness's knowledge.

00:11:00  4              Ms. Moreno, please correct me.

00:11:02  5              I think what we agreed is with respect to

00:11:04  6    the knowledge of the indictment and the charges in this

00:11:06  7    case, that the custodian's knowledge of the indictment

00:11:12  8    is limited to knowing that it's a conspiracy case

00:11:15  9    involving terrorism and that it's serious and nothing

00:11:18  10   further.

00:11:20  11             MS. MORENO:  We would so stipulate, Your

00:11:22  12   Honor.

00:11:22  13             THE COURT:  Very good.

00:11:26  14             MS. MORENO:  If I may just have a moment

00:11:28  15   please, Judge.

00:11:34  16             That's all in terms of what I would proffer

00:11:37  17   on behalf of Mrs. Nizamuddin.

00:11:39  18             THE COURT:  I may have questions, but I want

00:11:41  19   to see the documents first.  So you may excuse her, and

00:11:44  20   let's just keep going.

00:11:47  21             THE WITNESS:  Thank you.

00:11:54  22             THE COURT:  While we're at a break, our

00:12:01  23   reporter may have some questions about spellings.

00:12:07  24             MS. MORENO:  Coming in, Your Honor, is going

00:12:09  25   to be Nikhat, N-i-k-h-a-t, Nizamuddin,

| | | |
|---|---|---|
| 00:12:18 | 1 | N-i-z-a-m-u-d-d-i-n. |
| 00:12:35 | 2 | Your Honor, this is Mrs. Nizamuddin.  I |
| 00:12:38 | 3 | would proffer to the Court on her behalf that she is |
| 00:12:43 | 4 | Asif Salim's mother-in-law, that she has known Asif for |
| 00:12:47 | 5 | over ten years, that she is the owner of the property |
| 00:12:52 | 6 | family home -- she and her husband are the owners of the |
| 00:12:56 | 7 | family home that they built some 23 or 24 years ago. |
| 00:13:01 | 8 | And that this is -- she's also Farah's mother, and she's |
| 00:13:05 | 9 | also Sabrina's mother, Sabrina being the ADA that I |
| 00:13:09 | 10 | previously referenced.  Mrs. Nizamuddin is an American |
| 00:13:15 | 11 | citizen.  I have discussed with her what her |
| 00:13:18 | 12 | responsibilities would be with respect to being a |
| 00:13:21 | 13 | custodian, the consequences if Asif did not comply with |
| 00:13:26 | 14 | all the conditions that hopefully will be set, that she |
| 00:13:30 | 15 | could lose her family home, the gave consequences that |
| 00:13:35 | 16 | would ensue.  She has told me repeatedly she completely |
| 00:13:40 | 17 | understands that and she is very willing to move forward |
| 00:13:44 | 18 | in that regard.  There is a message I am to deliver on |
| 00:13:51 | 19 | behalf of her husband, who is just -- couldn't be here. |
| 00:13:55 | 20 | He is in ill health, and he wanted the Court -- wanted |
| 00:14:00 | 21 | me to tell the Court that he completely supports this |
| 00:14:02 | 22 | action.  He is also -- |
| 00:14:11 | 23 | (Discussion had off the record.) |
| 00:14:15 | 24 | MS. MORENO:  Sorry, Your Honor.  He is the |
| 00:14:17 | 25 | co-owner of the property, and he's also an American |

00:14:22  1  citizen, retired from the Department of Agriculture for

00:14:26  2  the State of Georgia.

00:14:28  3          THE COURT:  Does the Government wish to

00:14:30  4  inquire of this witness under oath?

00:14:32  5          MR. GEORGALIS: No, Judge.  Similar to the

00:14:34  6  first custodian, the parties have discussed a

00:14:37  7  stipulation in this case.

00:14:38  8          And again, Ms. Moreno, please correct me if

00:14:41  9  I'm wrong.

00:14:41  10          The parties have discussed what the

00:14:44  11  Defendant's mother-in-law knows about the charges in

00:14:46  12  this case, and we're prepared to stipulate that she

00:14:50  13  knows nothing of the charges in this case, doesn't know

00:14:53  14  what the case is about, and her knowledge is extremely

00:14:56  15  limited in that regard.

00:14:58  16          MS. MORENO:  So stipulated, Your Honor.

00:15:00  17          THE COURT:  Very good.  Thank you.

00:15:13  18          (Mrs. Nizamuddin exits the courtroom.)

00:15:30  19          THE COURT:  Who do we have next?

00:15:33  20          MS. MORENO:  We have Shakila Salim, who is

00:15:37  21  Asif's mother, wanting to be introduced to the Court, is

00:15:42  22  here with the family.  She is the custodian for Sultane

00:15:47  23  Salim, the co-defendant in this case.

00:16:00  24          Thank you, Your Honor.  The Court can hear

00:16:03  25  me without the microphone?  She wanted to be introduced

00:16:08   1   to the Court.  If the Court had an issue with respect to

00:16:13   2   the supervision being in the state of Georgia, Mrs.

00:16:19   3   Salim has told me that she would gladly offer her home,

00:16:23   4   which I know there has already been a report done on and

00:16:26   5   she has been interviewed with respect to Sultane, the

00:16:30   6   co-defendant, also her son in this case, that she would

00:16:33   7   be willing to act as a custodian and have Asif be

00:16:38   8   supervised in Ohio.  I am just bringing this to the

00:16:42   9   Court's attention for Your Honor's consideration.  But

00:16:45   10   she has offered to do that, Your Honor.

00:16:48   11             THE COURT:  Thank you.  Does the Government

00:16:51   12   wish to cross-examine this -- or examine this witness

00:16:54   13   under oath?

00:16:54   14             MR. GEORGALIS: May I have a minute to speak

00:16:57   15   with Ms. Moreno, Judge?

00:17:00   16             THE COURT:  You may.

00:17:02   17             (Discussion had off the record between

00:17:05   18   counsel.)

00:17:06   19             MR. GEORGALIS: No, Judge.  No need to place

00:17:08   20   this witness under oath.  But in lieu of that, the

00:17:10   21   Government and Ms. Moreno have discussed another

00:17:13   22   stipulation that would be similar to the stipulation for

00:17:16   23   the Defendant's mother-in-law, that being that this

00:17:18   24   custodian also has no knowledge of the case itself, has

00:17:21   25   not read the indictment and is unaware of the charges

00:17:24  1   alleged against her son.

00:17:29  2                   MS. MORENO:  Thank you, Your Honor.

00:17:34  3                   THE COURT:  Do you so stipulate or agree

00:17:37  4   with the stipulation?

00:17:37  5                   MS. MORENO:  So stipulated.

00:17:39  6                   THE COURT:  Thank you.

00:17:40  7                   MS. MORENO:  Judge, the last person I wanted

00:17:41  8   to introduce to the Court is James Smith.  James Smith

00:17:46  9   is a current criminal investigator for the Assistant

00:17:53  10  District Attorney's Office in Georgia, Gwinnett County.

00:18:15  11                  Your Honor, I met James today, although I'd

00:18:19  12  heard a lot about him.  And I thought it was important

00:18:21  13  to introduce James to this Court.  Again, he is the

00:18:26  14  husband of Sabrina, so James is Asif's brother-in-law.

00:18:33  15  And I wanted to inform the Court that if there were

00:18:36  16  any -- if the Court had any issues with respect to

00:18:39  17  supervision of Asif, that James has a very impressive

00:18:47  18  pedigree in terms of his career in the police department

00:18:52  19  of Gwinnett County, former homicide detective, and he

00:18:58  20  is, as I said, the current investigator for the DA's

00:19:02  21  Office and that he has offered to also be a custodian

00:19:07  22  for Asif, to personally drive and make sure he makes any

00:19:11  23  court appearance that this Court orders for him to make,

00:19:14  24  that he will do anything that he can to insure that Asif

00:19:20  25  complies with all the conditions of confinement.  And it

| | | |
|---|---|---|
| 00:19:25 | 1 | is also his family home that is the second property that |
| 00:19:28 | 2 | is being offered in this case for -- as collateral |
| 00:19:37 | 3 | surety, Your Honor. |
| 00:19:39 | 4 | Does the Court have any questions for Mr. |
| 00:19:40 | 5 | Smith? |
| 00:19:42 | 6 | THE COURT:  Mr. Smith, can you tell me what |
| 00:19:45 | 7 | your current occupation is and who your current employer |
| 00:19:48 | 8 | is? |
| 00:19:49 | 9 | MR. SMITH:  Yes, Your Honor.  I'm currently |
| 00:19:51 | 10 | employed as a DA investigator in Gwinnett County, |
| 00:19:55 | 11 | Georgia.  I'm currently employed as a DA investigator |
| 00:20:10 | 12 | with Gwinnett County DA's office.  My employer is the |
| 00:20:15 | 13 | District Attorney of Gwinnett County, Georgia. |
| 00:20:19 | 14 | THE COURT:  What kind of crimes do you |
| 00:20:21 | 15 | investigate? |
| 00:20:22 | 16 | MR. SMITH:  Major crimes:  homicide, child |
| 00:20:26 | 17 | molestation, rape, anything that's a felony. |
| 00:20:28 | 18 | THE COURT:  Have you reviewed the indictment |
| 00:20:29 | 19 | in this case against the Defendant? |
| 00:20:30 | 20 | THE WITNESS:  I have not.  I've never seen |
| 00:20:32 | 21 | it. |
| 00:20:32 | 22 | THE COURT:  So you do not have any knowledge |
| 00:20:35 | 23 | with respect to the allegations, how serious they may or |
| 00:20:42 | 24 | may not be, that sort of thing; is that fair to say? |
| 00:20:45 | 25 | THE WITNESS:  I have no idea what the |

00:20:46   1   allegations are.  I'm aware of generally what the

00:20:48   2   allegations are.  I've not reviewed the indictment.  I'm

00:20:52   3   not aware of the facts of the case.  Basically I'm

00:20:54   4   here -- to be honest, there's --

00:20:58   5           THE COURT:  It's a good time to be honest

00:21:00   6   while standing in the well of a federal courtroom.

00:21:05   7           THE WITNESS:  I've never met Asif before.

00:21:07   8   This is the first time I've ever seen him.  There's

00:21:10   9   really no emotional connection between Asif and I.  I

00:21:12   10  know you could look at that one way or the other.

00:21:15   11  However, I'm willing to do whatever the Court asks to

00:21:18   12  make sure he shows up for all of his court appearances.

00:21:20   13  Like the attorney said, I will bring him here myself if

00:21:23   14  I have to.  If they want me to wake up at 2:00 in the

00:21:26   15  morning and drive to the house, I'll do that.  But as

00:21:28   16  far as the facts of the case, no, I have no idea as far

00:21:31   17  as what all the details are involved in that.

00:21:34   18          THE COURT:  I take it since you've never met

00:21:36   19  him before -- well, I'm not sure of the answer to this

00:21:40   20  question, so let me ask you.  During the four years that

00:21:42   21  he was in the United Arab Emirates, did you have any

00:21:47   22  contact with him or his wife?

00:21:48   23          THE WITNESS:  After I married my wife.

00:21:51   24          THE COURT:  Which was when?

00:21:52   25          THE WITNESS:  2012, July 13, 2012.

00:21:56  1        THE COURT:  I take it he wasn't present for

00:21:57  2  that wedding?

00:21:58  3        THE WITNESS:  No.  We exchanged two to three

00:22:01  4  emails, just congratulations.  I said thank you.  And

00:22:04  5  that was it.

00:22:05  6        THE COURT:  So you have no knowledge of what

00:22:09  7  he was doing in the United Arab Emirates, what was

00:22:14  8  happening there?  You had no contact with him?

00:22:16  9        THE WITNESS:  No.  My understanding was he

00:22:18  10  had a job there and he was working, and that's where his

00:22:21  11  family was.

00:22:21  12        THE COURT:  Neither you nor your wife

00:22:24  13  visited him or his family while they were there?

00:22:28  14        THE WITNESS:  I never have.  My wife went to

00:22:30  15  India, but I don't know that they stopped in the UAE; I

00:22:34  16  don't know what they did in India -- to get stuff for

00:22:35  17  our wedding.  But I've never been.

00:22:37  18        THE COURT:  I don't know if the Government

00:22:38  19  has any questions.

00:22:39  20        Do you have any questions, counsel?

00:22:41  21        MR. GEORGALIS:  Maybe just a few, Judge.

00:22:44  22        THE COURT:  You know what, I'm going to do

00:22:45  23  this a little in reverse.  I'm going to have you take

00:22:48  24  the stand, if you don't mind, Mr. Smith.  Raise your

00:22:51  25  right hand.

00:22:53   1          Do you swear that the testimony you have

00:22:59   2   just given to me and will give will be truth, the whole

00:23:03   3   truth, and nothing but the truth, so help you God?

00:23:05   4              THE WITNESS:  I swear.

00:23:07   5              THE COURT:  I don't know how long he's going

00:23:08   6   to be, so I thought I might as well make you comfortable

00:23:12   7   and give you a seat.

00:23:13   8              THE WITNESS:  Thank you, Your Honor.

00:23:15   9                      - - -

00:23:15  10          JAMES SMITH, CROSS-EXAMINATION

00:23:16  11   BY MR. GEORGALIS:

00:23:16  12   Q.   Thank you, Judge.  Mr. Smith, my name is Chris

00:23:19  13   Georgalis.  I'm the prosecutor in this case.  I just had

00:23:23  14   a couple questions.  One thing that struck me is you had

00:23:27  15   said if the Court required you to drive the Defendant to

00:23:30  16   Ohio, to Toledo for purposes of hearings, that you'd do

00:23:34  17   that.  What makes you think that you would be required

00:23:37  18   to do so by the Court?

00:23:39  19   A.   Nothing.  It's just something I'm willing to do.

00:23:42  20   I'll do whatever, whatever they want me to do as far as

00:23:46  21   if he's going to be transferred to Atlanta and there's

00:23:49  22   any problems with communication or if they feel better

00:23:54  23   with me being there to put eyes on him and/or

00:23:58  24   transportation becomes an issue.  I'm just offering

00:24:02  25   that.  I have no idea if they would require me to do

00:24:04  1    that or not.

00:24:05  2        Q.  Do you understand that it's the Defendant's

00:24:07  3    obligation to appear for the hearings.  It's not your

00:24:10  4    obligation.  There won't be -- I imagine there won't be

00:24:11  5    a court order saying:  Mr. James Smith, you must bring

00:24:15  6    Asif Salim to Toledo on X date.

00:24:18  7        A.  I understand that.

00:24:20  8        Q.  So when you said if they ask me or require me to,

00:24:22  9    what did you mean by that?

00:24:24  10        A.  Well, we pledged our house up for bond purposes.

00:24:27  11    I guess what I'm saying is there's no way that he is not

00:24:30  12    going to be here.  If I have to bring him, he's going to

00:24:32  13    come.  I have no reason to believe that he would not

00:24:34  14    come.  I know it's his obligation, and he's going to do

00:24:38  15    it.  I have no doubt about that.

00:24:42  16        Q.  You, yourself, said that you would physically

00:24:44  17    drive him from Atlanta to Toledo for each and every one

00:24:48  18    of his hearing and drive him back from Toledo to

00:24:51  19    Atlanta?

00:24:51  20        A.  If that's what it took.

00:24:54  21        Q.  Not if that's what it took, but you would be

00:24:57  22    willing to do that?

00:24:58  23        A.  If that's -- yes.

00:24:59  24        Q.  For a case that could go on for many months,

00:25:02  25    several years, you'd take two or three days from work to

00:25:05  1    drive Mr. Salim to Toledo?

00:25:07  2        A.   Until I ran out of leave time.  And then if I ran

00:25:10  3    out of leave time, I'd ask for unpaid leave if I had to.

00:25:13  4        Q.   Okay.  One moment.

00:25:25  5              MR. GEORGALIS: Nothing further, Judge.

00:25:27  6    Thank you.

00:25:27  7              MS. MORENO:  Your Honor, I did have a

00:25:28  8    question.

00:25:29  9              THE COURT:  Sure.

00:25:30  10                        - - -

00:25:30  11             JAMES SMITH, REDIRECT EXAMINATION

00:25:31  12   BY MS. MORENO:

00:25:31  13       Q.   How close is your home with Sabrina to the family

00:25:34  14   home?

00:25:34  15       A.   Depending on traffic, between 20 minutes to 30

00:25:38  16   minutes.

00:25:39  17       Q.   How many miles away would that be, would you say?

00:25:41  18       A.   It's not very far mileage wise, maybe ten, 12

00:25:45  19   miles.

00:25:46  20       Q.   And do you think that they're a close family,

00:25:49  21   Sabrina and Farah and their mother and father?

00:25:53  22       A.   Absolutely, very close.

00:25:54  23       Q.   And do you visit each other often?

00:25:56  24       A.   She goes over there every weekend, and I go over

00:26:00  25   there probably -- approximately every other weekend.

00:26:03  1          MS. MORENO:  I have nothing further, Your

00:26:06  2    Honor.

00:26:06  3          MR. GEORGALIS: Nothing further, Judge.

00:26:07  4    Thank you.

00:26:08  5          THE COURT:  Appreciate it.  You may step

00:26:09  6    down.

00:26:10  7          THE WITNESS:  Thank you.

00:26:15  8          MS. MORENO:  One moment, Your Honor.  I

00:26:24  9    think with respect to my burden of production, Your

00:26:27  10   Honor, I would rest on my papers and rest on my proffer

00:26:31  11   and the testimony received so far.

00:26:35  12          THE COURT:  Does the Government have any

00:26:36  13   questions about these documents that we were just

00:26:39  14   provided?

00:26:56  15          MR. GEORGALIS: Judge, in the brief review

00:26:58  16   we've had of this by the FBI, it's our belief that these

00:27:02  17   documents are what they purport to be; they are what Ms.

00:27:06  18   Moreno described them to be; they are evidence of some

00:27:09  19   employment in the UAE during the timeframe Ms. Moreno

00:27:12  20   had suggested.

00:27:15  21          MS. MORENO:  Thank you, counsel.

00:27:25  22          THE COURT:  Perhaps counsel or someone can

00:27:27  23   tell me what a GIS instructor/technical support position

00:27:34  24   is.

00:27:38  25          The first document, for the record -- we

00:27:42   1   don't have these marked, but there is an employment

00:27:44   2   offer dated September 16, 2012.

00:27:48   3        That's followed by in mostly Arabic a

00:27:54   4   document captioned "Professional License."  I'm not sure

00:28:01   5   what that license is.

00:28:04   6        Followed by a document dated July 10, 2013,

00:28:11   7   an employment memo to the Defendant, a position of

00:28:15   8   Professional Services Analyst.  Again, I don't know what

00:28:17   9   that is or means.  With a subject regarding "Upgrade to

00:28:22   10   family status," which appears to allow, perhaps, travel

00:28:31   11   for family members, I'm not sure.

00:28:34   12        Next document.  Same date; to the Defendant;

00:28:38   13   same position; Subject:  Incentives.  Indicating the

00:28:44   14   company is giving him an incentive.  I'm not sure what

00:28:50   15   currency that is.

00:28:53   16        Next, April 14, 2013, memo to the Defendant.

00:28:59   17   Same position.  Subject:  Increment, listing salary and

00:29:05   18   allowances.

00:29:08   19        All these documents, for the record, are

00:29:10   20   from GISTEC; that's at the top of each of these

00:29:20   21   documents, except for the second document I indicated,

00:29:26   22   which was the professional license.  That says,

00:29:28   23   "Government of Sharjah," S-h-a-r-j-a-h, "Economic

00:29:34   24   Development Department."

00:29:36   25        Continuing, the next document, September 30,

00:29:39  1  2015, another employment memo to the Defendant saying:

00:29:46  2  Position:  Professional Services Manager.  Subject:

00:29:50  3  Increment.  And again showing salary and allowances.

00:29:54  4          Next document, Employment Memorandum, again,

00:29:58  5  to the Defendant.  Position:  Professional Services

00:30:03  6  Analyst.  Subject:  Allowance for customer visits.

00:30:10  7  Appearing to allow for at least six customers per month.

00:30:16  8          Next, a different heading on the next two

00:30:21  9  documents:  International School of Creative Science.

00:30:25  10  First one dated May 18, 2011, offering a position; a

00:30:34  11  commencement date of August, 2011; reporting to Phase

00:30:40  12  Director, P-h-a-s-e, the job title being teacher.  And

00:30:44  13  it has several paragraphs indicating salary, probation,

00:30:48  14  benefits, relocation, mobility, additional employment,

00:30:52  15  and confidentiality.  There are no signatures on this

00:30:56  16  page.  It is addressed to Defendant at the Overland

00:30:59  17  Park, Kansas address.

00:31:02  18          Final document -- I'm sorry, second to final

00:31:05  19  document.  This is again from the School of Creative

00:31:08  20  Science dated June 28, 2012, to whom it may concern,

00:31:14  21  certifying the Defendant worked at that School of

00:31:17  22  Creative Science -- not sure where it is -- from

00:31:21  23  September 4, 2011 until June 28, 2012.  Reflecting the

00:31:35  24  author being the principal, Walid Ramadan,

00:31:43  25  R-a-m-a-d-a-n.  There is a stamp for the International

| | | |
|---|---|---|
| 00:31:46 | 1 | School of Creative Science.  And there may be a |
| 00:31:49 | 2 | signature from that stamp also on that page. |
| 00:31:54 | 3 | The final document I have, I think is out of |
| 00:31:56 | 4 | order.  I think it is actually the second page to the |
| 00:32:02 | 5 | May 18, 2011 letter to the Defendant at the Overland |
| 00:32:09 | 6 | Park, Kansas address.  It seems to fit because there are |
| 00:32:14 | 7 | additional paragraphs, and there is a signature line at |
| 00:32:17 | 8 | the very end with what may be the Defendant's signature |
| 00:32:21 | 9 | indicating he has read, understood, and agrees to the |
| 00:32:24 | 10 | terms of that position. |
| 00:32:26 | 11 | I hope I have accurately summarized the |
| 00:32:28 | 12 | documents that we've been given, that way the record can |
| 00:32:32 | 13 | reflect them.  To the extent defense counsel or |
| 00:32:35 | 14 | Defendant can provide additional information helping to |
| 00:32:38 | 15 | explain these, they may do so, or not. |
| 00:32:40 | 16 | MS. MORENO:  Yes, Your Honor.  With respect |
| 00:32:41 | 17 | to the currency, it's dirhams, the AED, those are |
| 00:32:46 | 18 | dirhams. |
| 00:32:47 | 19 | With respect to the two documents, I just |
| 00:32:49 | 20 | wanted it to be clear, that are entitled -- one is |
| 00:32:52 | 21 | entitled "Professional License," and the other is |
| 00:32:55 | 22 | entitled "Professional Register Certificate" from the |
| 00:32:59 | 23 | Government of Sharjah.  These are licenses -- if the |
| 00:33:04 | 24 | Court can look down, you see a category called "trade |
| 00:33:07 | 25 | name."  So these are not Mr. Salim's professional |

00:33:12   1   license or certificate.  This is the certificate and

00:33:15   2   license for the company, Gulf Survey and Engineering

00:33:20   3   Services, which is also Isotec, which was his employer.

00:33:25   4   I just wanted that -- I didn't want the Court to think

00:33:28   5   that we were proffering this as his license because

00:33:31   6   we're not.  And also, Your Honor, obviously, as the

00:33:34   7   Court stated, the documents are somewhat out of order.

00:33:37   8            THE COURT:  And the document you just

00:33:39   9   referenced is front and back, I should have mentioned.

00:33:41  10   The front is "Professional License" at the top, and the

00:33:44  11   back is "Professional Register Certificate."

00:33:48  12            MS. MORENO:  Yes, Your Honor.  Thank you.

00:33:52  13   I would submit on that.

00:34:05  14            THE COURT:  Does the Government have any

00:34:07  15   questions about these documents?

00:34:10  16            MR. GEORGALIS: No, no questions, Judge.

00:34:12  17   Thank you.

00:34:18  18            THE COURT:  Any further testimony or

00:34:23  19   documents from the Defendant or proffers?

00:34:29  20            MS. MORENO:  Not unless the Court has an

00:34:31  21   area of concern or questions, I would submit.

00:34:39  22            THE COURT:  Does the Government have any

00:34:41  23   evidence or documents or testimony they wish to offer?

00:34:45  24            MR. GEORGALIS: Judge, just in the form of

00:34:46  25   various proffers and various documents the Government

00:34:49  1  would proffer the PSR as mentioned by the Court.  We'd

00:34:53  2  proffer the indictment for the Court's consideration,

00:34:55  3  the stipulations that were discussed here today, as well

00:35:05  4  as the Government's brief.

00:35:13  5        THE COURT:  Then let me offer this for

00:35:15  6  counsel to comment on.  Based on the briefing you

00:35:19  7  presented to me and my understanding of the law, the

00:35:22  8  Defendant faces a presumption of detention by statute,

00:35:26  9  specifically 18 U.S.C., Section 1342(e)(3).  Am I right

00:35:33  10  so far?

00:35:35  11        MS. MORENO:  Yes.

00:35:37  12        MR. GEORGALIS: I'm sorry.  I thought it was

00:35:44  13  18 U.S.C. 3142.

00:35:48  14        THE COURT:  Yes.  Thank you.  You paid

00:35:49  15  attention.  I transposed the first few numbers.

00:35:55  16        We have two counts here, a conspiracy -- I'm

00:35:58  17  sorry, Counts 1 and 2 are Conspiracy to Provide Material

00:36:01  18  Support to Terrorists and Providing Material Support to

00:36:05  19  Terrorists.  These are federal crimes of terrorism

00:36:08  20  listed under another statute that have maximum

00:36:12  21  punishments greater than ten years.  We have a grand

00:36:16  22  jury indictment which, by itself, establishes probable

00:36:19  23  cause to believe the Defendant committed the charged

00:36:21  24  crimes.  And I would cite for support for that notion

00:36:27  25  the Sixth Circuit case of Hazime, H-a-z-i-m-e, from

00:36:31   1   1985.

00:36:34   2           My next question for counsel is:  There have

00:36:36   3   been a list of proposed conditions.  The Defendant

00:36:40   4   argues that they would rebut the presumption.  Am I

00:36:43   5   right about that?

00:36:44   6           MS. MORENO:  Yes, Your Honor.

00:36:44   7           THE COURT:  And the Government would

00:36:45   8   disagree.  And the primary basis for the Government's

00:36:51   9   disagreement would be that the Defendant was out of the

00:36:55  10   country for some four years in the UAE.  Do I have that

00:37:00  11   right?

00:37:01  12           MR. GEORGALIS: I'd say that would be the

00:37:03  13   primary, Judge.

00:37:04  14           THE COURT:  You've also argued the fact that

00:37:06  15   the Defendant would not be in the district, that he

00:37:11  16   would be in Duluth, Georgia.  Frankly, I find that to be

00:37:15  17   not a reason in and of itself, perhaps.  But I do want

00:37:21  18   to focus on the time outside the country for four years

00:37:26  19   and ask the Government:  With the documents it had been

00:37:31  20   presented today, how do you feel about that period of

00:37:34  21   time?

00:37:34  22           MR. GEORGALIS: Judge, the Government's

00:37:35  23   reaction to the documents that were provided today is

00:37:38  24   that these documents actually cut against release of

00:37:41  25   this Defendant.  It shows that Mr. Salim is able to live

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 00:37:45 | 1  | abroad and live a gainful life, to seek and gain             |
| 00:37:51 | 2  | employment, to earn a living, in a foreign country.  And     |
| 00:37:55 | 3  | he did so for four years in the UAE, not coming back to      |
| 00:37:59 | 4  | the United States at all.  That suggests to us that he       |
| 00:38:02 | 5  | is a flight risk, that he can go to another country, has     |
| 00:38:06 | 6  | the ability, skill set and talent as well as the will to     |
| 00:38:12 | 7  | get a job, to be employed, to live elsewhere, and to         |
| 00:38:16 | 8  | leave the district and to leave the country.  These          |
| 00:38:18 | 9  | documents to us suggest that he is a significant flight      |
| 00:38:22 | 10 | risk, more so than most Defendants that come through         |
| 00:38:26 | 11 | many federal courtrooms.  This is proof that he can live     |
| 00:38:29 | 12 | abroad.  So that, to us, cuts against his release.           |
| 00:38:35 | 13 | THE COURT:  Let me ask Defense counsel.  Can                 |
| 00:38:37 | 14 | you comment on that?  And also comment on if the             |
| 00:38:41 | 15 | Defendant is released, what his plan is.  What kind of       |
| 00:38:44 | 16 | employment might he seek?  Who's going to support his        |
| 00:38:48 | 17 | family?  What have you to say on any of that along with      |
| 00:38:52 | 18 | what the Government just said?                                |
| 00:38:53 | 19 | MS. MORENO:  Thank you, Your Honor.  With                    |
| 00:38:55 | 20 | respect to living abroad, pardon my south Bronx              |
| 00:39:03 | 21 | expression, it's damned if you do and damned if you          |
| 00:39:05 | 22 | don't.  He could live abroad because he could get there      |
| 00:39:08 | 23 | legally; he had a passport; he had a visa.  He doesn't       |
| 00:39:12 | 24 | have any of those things now.  There is no carrier that      |
| 00:39:15 | 25 | is going to board someone with zero travel documents         |

00:39:20  1   with no passport.

00:39:23  2              THE COURT:  Someone could get a false

00:39:25  3   passport; that does happen.

00:39:27  4              MS. MORENO:  This happens in every case.

00:39:29  5   That could be the Government's default position in any

00:39:32  6   case, Judge.  I'm suggesting it's not in this case

00:39:35  7   because when you look at the whole, the totality of this

00:39:38  8   case, the support and the ties that he has to his family

00:39:41  9   and the kind of family that he has, that that militates

00:39:45  10  against all of that.  And with respect to his plan,

00:39:49  11  frankly, he -- yes, he is -- he graduated from Ohio

00:39:57  12  State University in geographic information systems,

00:39:59  13  which is what he was working on abroad.  He could -- I

00:40:08  14  failed to mention, I'm so sorry --

00:40:11  15             THE COURT:  I'm sorry, what did you fail to

00:40:14  16  mention?

00:40:15  17             MS. MORENO:  I failed to mention, although

00:40:18  18  it was in the Government's papers, but I failed to

00:40:21  19  mention that Asif did not contest deportation when he

00:40:27  20  was arrested by the ministry of the interior in the UAE.

00:40:33  21  So he voluntarily came back to face this case.

00:40:37  22             With respect to a plan, I think that is a

00:40:40  23  dynamic ongoing process.  I can tell the Court that he

00:40:45  24  very much wants to work, and that it would be a matter

00:40:50  25  of -- because I've just been through this -- of working

| | | |
|---|---|---|
| 00:40:54 | 1 | out with the Pretrial Services Office the kind of curfew |
| 00:41:00 | 2 | that would allow him to work in whatever capacity that |
| 00:41:02 | 3 | he could.  Right now -- and I made a point of that in my |
| 00:41:06 | 4 | papers, which I think again militates for release.  This |
| 00:41:10 | 5 | is not a man of means.  He doesn't have a cache of |
| 00:41:17 | 6 | money.  So right now he is dependent upon his family, |
| 00:41:20 | 7 | and that is something that has really never been the |
| 00:41:23 | 8 | case since he's been married for the last ten years.  So |
| 00:41:26 | 9 | there are a number of options for him to explore.  I |
| 00:41:30 | 10 | don't want to speculate to the Court, but I know that he |
| 00:41:35 | 11 | very much wants to get back and help support his family, |
| 00:41:39 | 12 | as he's done for the last decade.  And this would, of |
| 00:41:43 | 13 | course, be in compliance with Pretrial Services and the |
| 00:41:46 | 14 | kinds of curfews that they do allow for work schedules. |
| 00:41:53 | 15 | THE COURT:  So after I consider whether the |
| 00:41:55 | 16 | proposed conditions rebut the presumption, that doesn't |
| 00:42:01 | 17 | end the inquiry.  The Government argues even if so, the |
| 00:42:05 | 18 | Court must consider whether detention is appropriate, |
| 00:42:08 | 19 | addressing the factors under 18 U.S.C., Section 3142(g). |
| 00:42:15 | 20 | And those factors include the nature of the crime |
| 00:42:19 | 21 | charged.  And here we're talking about terrorist acts |
| 00:42:23 | 22 | and obstruction of an investigation as well.  The |
| 00:42:27 | 23 | Government notes in its brief that Anwar Al-Awlaki, a |
| 00:42:33 | 24 | 2010 designated key Al Qaeda leader.  The indictment |
| 00:42:38 | 25 | details that co-defendants delivered funds to Yemen in |

| | | |
|---|---|---|
| 00:42:44 | 1 | July of 2012, $29,000 total, including $2,000 provided |
| 00:42:50 | 2 | by this Defendants.  The Government also in its memo |
| 00:42:52 | 3 | indicates while that may not seem like a lot of money, |
| 00:42:56 | 4 | placed in context, the Government describes how much |
| 00:43:00 | 5 | harm can be caused by bombs made with as little as |
| 00:43:04 | 6 | $2,000. |
| 00:43:07 | 7 | The weight of the evidence is another factor |
| 00:43:09 | 8 | addressing the risk of flight, danger to the community. |
| 00:43:12 | 9 | And here we have, the Government alleges in its brief, |
| 00:43:16 | 10 | documented support for terrorism, and specifically a |
| 00:43:20 | 11 | terrorist that the indictment establishes probable |
| 00:43:25 | 12 | cause. |
| 00:43:25 | 13 | I look to the history and characteristics of |
| 00:43:27 | 14 | the Defendant.  Thirty-five years old, U.S. citizen, |
| 00:43:31 | 15 | married ten years, four children, no criminal history. |
| 00:43:35 | 16 | Loose ties to the United States, four years outside the |
| 00:43:38 | 17 | United States since 2011.  Proposed to stay with |
| 00:43:45 | 18 | in-laws.  This has never been his home before.  This |
| 00:43:48 | 19 | would be a new place for him and his family.  No |
| 00:43:53 | 20 | employment in the U.S. |
| 00:43:55 | 21 | Also looking at the nature and seriousness |
| 00:43:57 | 22 | of danger to the community posed by the release.  And |
| 00:44:01 | 23 | again, the Government would point to jihad and terrorism |
| 00:44:05 | 24 | as set forth in the indictment. |
| 00:44:08 | 25 | Taking into account also education and |

00:44:10  1    employment history.  We've touched on that with the

00:44:14  2    documents that have been provided today from August 2011

00:44:19  3    to November 2015 in the UAE.  Residing in Overland Park,

00:44:26  4    Kansas from October of '07 to August of 2011; residing

00:44:30  5    in Pompano Beach, Florida from July of '06 to October of

00:44:34  6    '07.  I'm not sure what was going on during those time

00:44:38  7    periods and those places.

00:44:41  8              Defense counsel has emphasized the family.

00:44:45  9    Mother, brother, and sister in Cambridge, Ohio; youngest

00:44:51  10   sister in Pakistan.  The family in Georgia.  Apparently

00:44:55  11   the father has been travelling in Pakistan for several

00:44:57  12   months, unknown location, unknown occupation.  Those

00:45:05  13   are, as I have it, the factors and some of facts that

00:45:09  14   both sides have highlighted.

00:45:11  15             I take it it is the Government's position

00:45:13  16   that the conditions of release are really not a problem

00:45:21  17   for the Government.  I know defense counsel has used the

00:45:24  18   phrase almost guaranteed.  While the Government might

00:45:30  19   quibble with that description, the Government really

00:45:32  20   doesn't have a problem with the conditions if there were

00:45:34  21   to be a release, but the Government's position is there

00:45:37  22   shouldn't be a release because of the nature of the

00:45:42  23   alleged crime in this case, and the factors under

00:45:45  24   3142(g).

00:45:47  25             Do I have it right?

00:45:48  1      MR. GEORGALIS:  That is correct, Judge.  The

00:45:49  2  Government believes there are no conditions or set of

00:45:51  3  conditions that would insure the safety of the community

00:45:54  4  or that the Defendant will continue to appear as

00:45:56  5  required.

00:45:56  6      THE COURT:  And what really bothers you --

00:45:58  7  those are my words -- is the period of time outside this

00:46:01  8  country.  And specifically what bothers you about that?

00:46:06  9      MR. GEORGALIS:  Well, Judge, what bothers us

00:46:09  10  about it is the fact that he has been living abroad for

00:46:13  11  four years, that as a U.S. citizen he has not come back

00:46:17  12  to this country, that the only reason that he is here

00:46:20  13  today is to stand trial for federal criminal terrorism

00:46:25  14  charges in Toledo, Ohio.  He's not -- he was not brought

00:46:30  15  here to vacation with his family in Georgia.  He's here

00:46:33  16  because he was indicted by a federal grand jury on very

00:46:36  17  serious charges.  So the only reason he is here is for

00:46:39  18  this case.  The fact that he's lived abroad for four

00:46:43  19  years stresses the fact that he has virtually no ties or

00:46:47  20  roots to tie him to this country.  He certainly has none

00:46:51  21  tying him to the District, which is why he's proposing

00:46:54  22  to live only in Georgia, not here.  So, Judge, the

00:46:57  23  absence of a presence here in this country, the absence

00:47:01  24  of roots here or anything tying into Toledo, those are

00:47:05  25  concerns for us.  They suggest that he is a significant

00:47:09  1    flight risk.

00:47:10  2            And the standard for flight risk is only

00:47:13  3    that of preponderance.  Having lived abroad, having been

00:47:18  4    deported to come to this country to stand charges to us

00:47:22  5    suggests that he ought to be detained.

00:47:28  6            THE COURT:  I take it if you were in the

00:47:29  7    United States during that period of time, you wouldn't

00:47:35  8    be having as much of a problem?

00:47:36  9            MR. GEORGALIS: It would be a different

00:47:38  10   story.  It would be more akin to the situation with his

00:47:42  11   brother, Sultane Salim.  You have to look at each one of

00:47:46  12   the Defendants as individuals.  With Sultane Salim the

00:47:50  13   Government still opposed release given the seriousness

00:47:52  14   of the charges.  The seriousness of the charges is also

00:47:54  15   a consideration here, which I'll get to, Judge.  But it

00:47:57  16   is a different situation.  The absence from this country

00:48:00  17   for four years, it's a paradigm shift.

00:48:04  18           THE COURT:  Do you have any information --

00:48:05  19   and I take it it is probably more difficult for the

00:48:09  20   Government to get information on someone who's outside

00:48:12  21   the country than if they're in the country.  Have you

00:48:15  22   any information pro or con about the Defendant's

00:48:20  23   activities or emails during that four-year period?

00:48:26  24           MR. GEORGALIS: Could I have a moment,

00:48:28  25   please, Judge?

00:48:28  1          THE COURT:  Yes.

00:48:30  2          (Discussion had off the record.)

00:48:51  3          MR. GEORGALIS: Judge, the only conduct of

00:48:52  4  this kind as alleged in the indictment would be the

00:48:55  5  obstruction-related conduct that obviously occurred

00:48:58  6  after he had made the contribution to Al-Awlaki that's

00:49:03  7  alleged in the indictment.  I believe there was an

00:49:05  8  interview involving the Defendant in 2012 in the UAE

00:49:09  9  and -- where we would argue on trial he made false

00:49:13  10  statements or was sort of obstructive in that regard.

00:49:17  11  But that's all that we could share at this time.

00:49:21  12          THE COURT:  Do you wish to comment?  You

00:49:23  13  may.  We're going to move on and talk about another

00:49:25  14  topic, but I'll give you a chance to respond.

00:49:26  15          MS. MORENO:  Just briefly, as alleged in the

00:49:28  16  indictment, he met with investigators in 2012 in the

00:49:34  17  UAE, FBI agents, voluntarily; he was under no compulsion

00:49:43  18  to do that.  He met with them voluntarily.  And that is

00:49:46  19  what he said to them is the basis -- the allegation of

00:49:50  20  one of the charges.  I.

00:49:52  21          Would also just briefly say, Your Honor,

00:49:53  22  that it is just basically untrue that he has no roots to

00:49:58  23  this country.  You met his mother, his brother, his

00:50:03  24  wife, his mother-in-law.  He has significant pervasive

00:50:08  25  important family here in the country.  Thank you.

00:50:14  1          THE COURT:  So I'll give both sides a chance

00:50:16  2    to argue then whether detention is appropriate, given

00:50:25  3    the nature of the crime charged under 18 U.S.C., Section

00:50:29  4    3142(g).  I'll let the Government go first on that one

00:50:35  5    since there seems to be a general agreement that

00:50:40  6    proposed conditions and the posting of property and the

00:50:47  7    custodians and the dollar amount are generally

00:50:51  8    acceptable.

00:50:53  9          MR. GEORGALIS:  That's correct, Judge.  And

00:50:55  10   thank you for the opportunity to argue.

00:50:57  11          As this Court has stated, Mr. Salim is

00:51:00  12   subject to the presumption of detention.  Unlike most

00:51:03  13   Defendants that come through this courthouse, the

00:51:06  14   default position is they should be released pending

00:51:08  15   trial.  That is not the case here.  Given the nature of

00:51:12  16   the crime here, that it is a terrorist charge, that a

00:51:15  17   grand jury has returned an indictment against him

00:51:18  18   finding probable cause that he committed these crimes,

00:51:20  19   and given that the maximum sentence is about ten years,

00:51:23  20   there is a presumption that he be detained.  That is

00:51:26  21   something that Congress felt that there are certain

00:51:29  22   Defendants that, based upon the conduct and the charge,

00:51:32  23   they should not be released.  And Mr. Salim is one of

00:51:35  24   those individuals.  And I --

00:51:37  25          THE COURT:  Is it your position in every

00:51:39  1   case involving an alleged terrorist there ought to be

00:51:42  2   detention, or not in every case, but under the facts of

00:51:46  3   this case?  Yes.

00:51:47  4        MR. GEORGALIS: Under the facts of this case

00:51:48  5   there should be a presumption.  Now, to Ms. Moreno's

00:51:53  6   point, that presumption can be overcome, as the law

00:51:56  7   requires.  But the Government believes that Ms. Moreno

00:51:59  8   has failed to overcome that presumption.  Simply stating

00:52:02  9   that a living arrangement in this country in another

00:52:06  10  state several states away, that that is simply is not

00:52:11  11  enough to overcome the presumption.  As we discussed at

00:52:14  12  length before, the Defendant has lived outside this

00:52:16  13  country for four years with his entire family.  He had

00:52:18  14  gainful employment there he earned there.  He has the

00:52:21  15  ability, the knowledge, and the skill set to lead a

00:52:25  16  gainful life outside of this country.

00:52:28  17        THE COURT:  I'm sorry to interrupt you.  I

00:52:31  18  don't want to lose my thought.  And you have talked

00:52:34  19  about the fact that he's not in Ohio; he's Georgia.  But

00:52:39  20  is there something wrong with the Probation/Pretrial

00:52:41  21  Services in Georgia?  Can they not supervise him as

00:52:44  22  effectively as Toledo?  Although our people are great, I

00:52:48  23  know.  In all seriousness, so what?  Georgia, Ohio; if

00:52:54  24  the conditions are good for Georgia, good for Ohio,

00:52:59  25  what's the problem there?

00:53:00  1          MR. GEORGALIS: I guess the main problem

00:53:02  2  there, Judge, is I don't know exactly what Georgia's

00:53:05  3  Pretrial Services are like.  I assume that they are just

00:53:08  4  as good as they are up here.  The main problem is just

00:53:12  5  getting here.  They're living several hundred miles

00:53:16  6  away.  It would require a day of travel on the road with

00:53:21  7  an individual -- James Smith, who testified here today,

00:53:24  8  that it -- he seems to be unsure whether he'd be able to

00:53:29  9  even do it.  It depends on his leave, I suppose.  There

00:53:31  10  are tremendous logistical obstacles to allowing a

00:53:35  11  Defendant that was brought to this country specifically

00:53:37  12  to face terrorism charges in Toledo, and releasing them

00:53:41  13  to Georgia and allowing them to travel across the

00:53:44  14  country multiple times a year back and forth just to

00:53:47  15  appear.  It's a great distance away.  I think it

00:53:51  16  provides a lot of strain on the system to allow him to

00:53:56  17  be that far and to allow him to travel unsupervised

00:54:01  18  during that period.  So it does provide, I think,

00:54:04  19  significant roadblocks and obstacles that a more

00:54:08  20  traditional sort of in-district custodianship would

00:54:12  21  provide.

00:54:12  22          THE COURT:  I interrupted you, and you were

00:54:14  23  talking also about his time outside the country.

00:54:17  24          MR. GEORGALIS:  Right, Judge.  So that, to

00:54:18  25  us, just goes to why we believe that Ms. Moreno's failed

00:54:23 1  to overcome the presumption in this case.  There has to

00:54:26 2  be more than just saying:  Well, he could live in this

00:54:29 3  place in this state; therefore, the presumption is

00:54:31 4  overcome.  It's an important presumption, and we think

00:54:34 5  it requires detention in this case.

00:54:36 6          But even if the Court finds that Ms. Moreno

00:54:38 7  has overcome the presumption, and as we wrote in our

00:54:42 8  briefs, it's not like that presumption just disappears,

00:54:45 9  just goes away.  It's always something that the Court

00:54:48 10  should consider and go back to in deciding whether or

00:54:51 11  not Mr. Salim is worthy of release.  And so therefore

00:54:54 12  it's always there; it should provide the backdrop to the

00:54:58 13  decision the Court has to make here.

00:55:00 14          But I think the more important part of this

00:55:03 15  part of the analysis is to really focus on his risk of

00:55:06 16  flight and his danger to the community and the focus on

00:55:09 17  the factors.

00:55:10 18          So the first is the nature and circumstances

00:55:12 19  of the offense here, Judge.  And obviously as this Court

00:55:15 20  even said, these are very serious charges.  The

00:55:18 21  Defendant was charged in a four-count indictment with

00:55:21 22  three charges, that being Conspiracy to Provide Material

00:55:25 23  Support, Providing Material Support, and Conspiring to

00:55:29 24  Obstruct Justice.  Those are extremely serious crimes,

00:55:31 25  perhaps the most serious in the entire federal criminal

00:55:34  1  code.

00:55:36  2          To the extent that -- when considering the

00:55:39  3  actual factors, the nature and circumstances of the

00:55:41  4  offense lists as one of those offenses that one might

00:55:46  5  consider as weighing in favor of detention is listed

00:55:49  6  terrorism itself.  So it's even specifically delineated

00:55:52  7  in the statute that a terrorism charge is one that the

00:55:57  8  Court should seriously consider.

00:55:58  9          THE COURT:  You wouldn't deny, counsel, that

00:56:03  10  terrorism is a serious charge, would you?

00:56:05  11          MS. MORENO:  Of course not.  That's not my

00:56:06  12  argument, Judge.

00:56:07  13          THE COURT:  Let him finish.  I'll give you

00:56:11  14  the floor too.  I wanted to see where we could have

00:56:12  15  agreement.

00:56:13  16          MR. GEORGALIS:  That's good.  It's obviously

00:56:14  17  a factor and something for the Court to consider.  But

00:56:17  18  going deeper than just the charges itself is the actual

00:56:21  19  conduct here is of serious concern.  The indictment

00:56:23  20  alleges that Mr. Salim and his co-conspirators,

00:56:26  21  including his brother, conspired to provide and, in

00:56:26  22  fact, did provide funds to Anwar Al-Awlaki for use in

00:56:30  23  conducting terrorist attacks.  Judge, this is not a

00:56:34  24  sting case.  This is not a case where the Government

00:56:37  25  provided the funds to Mr. Salim to provide to another

00:56:41  1   Government undercover, which those are very serious

00:56:44  2   cases in and of themselves.  This is an entirely

00:56:47  3   different animal.  This is funds belonging to Mr. Salim

00:56:51  4   going to an actual -- in 2010 designated real terrorist

00:56:57  5   whose purpose was to conduct attacks against the United

00:57:00  6   States and against the west.  And in the months

00:57:02  7   following the contribution to Anwar Al-Awlaki did, in

00:57:06  8   fact, have an attack against the United States, which

00:57:08  9   I'll go in.

00:57:09  10          One of the arguments --

00:57:10  11          THE COURT:  Can I ask you to take a breath

00:57:12  12  and maybe a drink of water and slow down a moment.

00:57:17  13  Thank you.

00:57:17  14          MR. GEORGALIS: One of the arguments that Ms.

00:57:20  15  Moreno makes in her brief is that of the $29,000 that

00:57:25  16  was provided to Anwar Al-Awlaki, only $2,000 of it came

00:57:30  17  from Mr. Salim, as to somehow signify that that amount

00:57:36  18  is insubstantial or insignificant.  Now, the Government

00:57:39  19  disagrees, obviously.  I mean, that money might not be a

00:57:43  20  lot of money to Ms. Moreno, but that really misses the

00:57:46  21  point.  The question is, or the analysis should be:  Was

00:57:50  22  it a lot of money to Mr. Salim, number one?  And number

00:57:53  23  two, was it a lot of money to Anwar Al-Awlaki?  In

00:57:57  24  response to both questions, the answer is yes.  If you

00:58:00  25  look through the PSR, one of the Pretrial Services

00:58:05 1  officers had written that at one point the Defendant

00:58:08 2  stated that his total assets or his only asset, I should

00:58:12 3  say, at the time of the interview was $20,000 in a

00:58:16 4  checking account.  I don't know exactly how that money

00:58:21 5  has fluctuated over time, whether it's gone up or gone

00:58:23 6  down.  But if you think about $2,000 out of, let's say,

00:58:27 7  $20,000 that he stated he had, that's ten percent of his

00:58:32 8  entire net worth.  This is a man who has four kids to

00:58:37 9  support, a man who has a wife, a man who's living

00:58:40 10 overseas.  It shows the degree to which he was willing

00:58:46 11 to support the cause and the amount of which he was

00:58:49 12 willing to contribute.  And while Ms. Moreno might think

00:58:53 13 that's not a very large amount, with respect to Mr.

00:58:56 14 Salim it's an enormous amount.  Think about cutting a

00:59:00 15 check of ten percent of your net worth and just giving

00:59:03 16 it to somebody else; you don't know who that person is

00:59:08 17 in this context.  So that's number one.

00:59:10 18       The other factor is:  Was it a lot of money

00:59:12 19 to Anwar Al-Awlaki?  As this Court has pointed out in

00:59:15 20 our brief, clearly it was.  The AQAP, Al Qaeda in the

00:59:24 21 Arabian Peninsula, has its own publication.  In November

00:59:29 22 of 2010, as we wrote in our brief, they devoted some

00:59:33 23 time to a piece about failed terroristic attacks.  And

00:59:37 24 one in that particular piece related to printer

00:59:41 25 cartridges that were outfitted with bombs and how,

00:59:46  1   although that was a failed attempt to put those printer

00:59:50  2   cartridges on a Northwestern, I believe, plane, it only

00:59:54  3   cost them $4,200 to undertake that attempted attack.  So

01:00:01  4   that just goes to show how far money can go to support a

01:00:06  5   person who's willing to conduct terroristic attacks

01:00:09  6   against the United States.

01:00:10  7          Also in the brief were other examples.  I

01:00:12  8   believe --

01:00:13  9          THE COURT:  I've read the brief, so you

01:00:14  10  don't need to redo the brief, for my purposes anyway.

01:00:19  11  I'd rather you hit the highlights and add to the brief

01:00:23  12  or add further comment that's not reflected in any of

01:00:27  13  the writings that we've reviewed or the documents.

01:00:30  14          MR. GEORGALIS:  Okay.  I think then just the

01:00:32  15  percentage of Mr. Salim's net worth of that $2,000 is

01:00:36  16  something I think the Court should consider that was not

01:00:38  17  in the brief.

01:00:39  18          And, Judge, the other thing to consider is

01:00:42  19  obviously the weight of the evidence in this case.  And

01:00:45  20  it's not an invitation to conduct a mini trial here.

01:00:49  21  It's really to look at what the indictment has to say

01:00:52  22  about what Mr. Salim had engaged in.  In response to Ms.

01:00:56  23  Moreno's brief, she seems to suggest that Mr. Salim was

01:01:00  24  simply CC'ed on a lot of emails; and therefore, the

01:01:03  25  weight of the evidence and the case against him is

01:01:06 1 somehow weaker. The Government disagrees with that.

01:01:11 2 Some of the most important emails came from Mr. Salim.

01:01:13 3 One of the ones that sticks out in my mind is in the

01:01:16 4 brief, relates to Mr. Salim's statement to his brother

01:01:18 5 upon cutting the check to: Get it done. That is not

01:01:24 6 something that one would say to authorize some sort of

01:01:30 7 charitable contribution to a religious outfit or

01:01:36 8 charitable organization. The Government believes

01:01:38 9 there's more to it than that, that it's an important

01:01:41 10 statement, an important mission, that there is -- one

01:01:45 11 can infer that there's some almost chest pounding there.

01:01:50 12 There's almost like battle cry to a certain extent. We

01:01:54 13 think that's an important statement, and it's an

01:01:57 14 important statement that Mr. Salim made, and it's in the

01:01:59 15 indictment.

01:02:00 16 As far as the history and characteristics of

01:02:03 17 Mr. Salim go, we've discussed a lot of these in the

01:02:05 18 sense he has no employment in this district or in

01:02:08 19 Georgia or in the country. He has no ties at all to

01:02:10 20 this district. He arguably has some that were proffered

01:02:13 21 here today in Georgia. He's lived outside the United

01:02:17 22 States for four years.

01:02:18 23 With respect to the custodians that we've

01:02:20 24 seen that were brought here today, Judge, and my count

01:02:23 25 might be wrong, but I believe three of the custodians

01:02:26 1  have no idea what this case is even about.  They have no

01:02:29 2  idea that it's a terrorism charge and the seriousness of

01:02:32 3  the charge itself.  The one custodian that does know

01:02:35 4  something about the case knows -- seemed to me to be

01:02:39 5  pretty limited in that it's simply a conspiracy case

01:02:42 6  with some terrorism charges and that it was serious.  To

01:02:46 7  us these are not custodians that grasp the gravity of

01:02:50 8  the charge and the gravity of the situation and that

01:02:52 9  they might be unfit to be custodians.  One of the

01:02:55 10  custodians, James Smith, never even met him until today.

01:03:00 11          So, Judge, again the Government stresses

01:03:03 12  that the only reason the Defendant is here today is to

01:03:06 13  face terrorism charges in Toledo in the Northern

01:03:10 14  District of Ohio; therefore, we think that release --

01:03:14 15  that there are no conditions or set of conditions that

01:03:16 16  would insure his appearance or insure the safety of the

01:03:19 17  community.

01:03:20 18          THE COURT:  One final question, then I'll

01:03:22 19  turn the floor over to defense counsel.

01:03:23 20          Defense counsel has made the point a couple

01:03:28 21  times how cooperative the Defendant was, cooperated with

01:03:30 22  the interview abroad, cooperated in coming back to this

01:03:35 23  country; suggesting, I think, that that cooperation

01:03:37 24  reflects good intentions on his part.  Your comment?

01:03:41 25          MR. GEORGALIS: Well, Judge, I will say he

01:03:45  1   was interviewed in 2012.  It's not like he just hopped

01:03:49  2   on a plane and came back to the United States to deal

01:03:51  3   with the investigation.  We required a grand jury to

01:03:56  4   indict him.  It required his visa in UAE to be revoked.

01:04:00  5   It required the UAE to deport him to this country in

01:04:03  6   order for him to be here.  It's not like he just

01:04:04  7   appeared in this country of his own free will to face

01:04:07  8   the charges alleged against him.  I guess the

01:04:11  9   cooperation is in the eye of the beholder, but I would

01:04:14  10  not consider what he's done so far cooperative.

01:04:17  11             One moment please, Judge.

01:04:33  12             THE COURT:  Sure.

01:04:33  13             (Discussion had off the record.)

01:04:33  14             MR. GEORGALIS: I think that's all we have,

01:04:36  15  Judge.

01:04:36  16             MS. MORENO:  I just prefer to stand, Judge.

01:04:38  17             THE COURT:  However you like to do it as

01:04:40  18  long as we can hear you, and as long as you don't talk

01:04:43  19  too fast.

01:04:44  20             MS. MORENO:  All right.  I will be careful.

01:04:48  21             You know, Congress could have made these

01:04:52  22  offenses with an irrebuttable presumption, Your Honor.

01:04:58  23  They could have done that.  They did not do that.  They

01:05:02  24  decided that these cases and others would have a

01:05:07  25  presumption that could be rebutted given an adequate

01:05:11  1  showing.

01:05:12  2              THE COURT:  The Government doesn't dispute

01:05:13  3  that, do you?

01:05:14  4              MR. GEORGALIS: We do not, Judge.

01:05:16  5              MS. MORENO:  Well, they kind of talk like

01:05:18  6  this is a non-bailable offense; this is a terrorism

01:05:21  7  offense.  We know how serious it is, but it is not a

01:05:25  8  non-bailable offense.

01:05:26  9              And I was glad to hear that the

01:05:29  10  Government candidly told the Court that they also

01:05:36  11  opposed the co-defendant, Sultane Salim's, release, who

01:05:41  12  lived in the country.  It didn't matter, really, in the

01:05:45  13  Government's eyes if you live in the country, don't live

01:05:48  14  in the country.  They're going to oppose because it's a

01:05:50  15  terrorism case really.

01:05:52  16              And I say to this Court that that's just not

01:05:54  17  enough.  That if we have significant conditions -- we

01:05:59  18  have testimony from the family.  James Smith's

01:06:04  19  testimony, I think, is really rather remarkable.  In

01:06:07  20  fact, it is important, and I think that he does not have

01:06:12  21  any emotional investments or allegiance to Asif Salim.

01:06:17  22  This is a former homicide detective, law enforcement guy

01:06:22  23  who has told this Court under oath that he would do

01:06:25  24  whatever it takes to bring Asif Salim to any proceedings

01:06:30  25  that he has.  I think that's very compelling in this

01:06:33  1   case.

01:06:35  2              I'm not going to go over the arguments in

01:06:38  3   our brief, Judge.  We've now given the Court paperwork

01:06:43  4   that shows what he did in terms of his employment for

01:06:48  5   the four years out of the 35 years that he's lived in

01:06:51  6   the United States, four years he worked in the UAE.

01:06:58  7              Counsel misapprehends what I said about the

01:07:01  8   $2,000 in my brief.  I didn't argue that that was an

01:07:06  9   insignificant amount.  What I said was that their

01:07:09  10  allegations were limited to this single check for

01:07:14  11  $2,000, that, by the way, was not made to Anwar

01:07:19  12  Al-Awlaki, who at the time was not a designated

01:07:22  13  terrorist -- let's not forget that either -- but was

01:07:26  14  made apparently to a co-defendant, who the Government is

01:07:30  15  going to say then got this money somehow to someone

01:07:34  16  associated with Anwar Al-Awlaki.  That's their case

01:07:38  17  here.

01:07:40  18             So I don't want this to be a mini trial.  I

01:07:43  19  think that when the Court looks at the weight of the

01:07:46  20  evidence and the seriousness of the offense, you've got

01:07:49  21  to tie that back to:  Are there any set of conditions

01:07:52  22  that you can set that will protect the community,

01:07:56  23  rightly so, and make sure that he makes his court

01:08:00  24  appearances?  And I think that we have submitted to this

01:08:03  25  Court ample reason, ample grounds, testimony and

01:08:08  1   conditions that two Pretrial Services officers have

01:08:12  2   found would be valid for release.   We have the Virginia

01:08:17  3   Pretrial Service office that recommended his release to

01:08:20  4   Georgia, given a panoply of conditions, and now we have

01:08:27  5   this one too.  And I would submit it, Your Honor.

01:08:30  6           THE COURT:  Any final words from the

01:08:32  7   Government?

01:08:32  8           MR. GEORGALIS: No, Judge.  Thank you.

01:08:34  9           THE COURT:  Thank you.  Thank you both.

01:08:36  10  This Court is going to take this matter under

01:08:38  11  advisement.  It's my plan to issue an order one way or

01:08:43  12  the other tomorrow, and I'm going to take time between

01:08:51  13  now and then to reflect.  I appreciate your help today.

01:08:56  14  I think I'd like counsel to check in with my deputy

01:09:02  15  clerk before you leave in case there's some paperwork

01:09:06  16  that we may need from you.  Other than that, we are

01:09:09  17  adjourned.

18           (Concluded at 3:55 p.m.)

19                   - - -

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7   /s/ Tracy L. McGurk _____              ___2/28/17___

8   Tracy L. McGurk, RMR, CRR                      Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25